**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SAJJAD CHOWDHURY, INDIVIDUALLY, AS NEXT OF KIN, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SHAHEDA CHOWDHURY, DECEASED<br>            Plaintiffs,<br><br>JOHNSON & JOHNSON, INC., JOHNSON & JOHNSON CONSUMER, INC. f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC., LLT MANAGEMENT, LLC F/K/A LTL MANAGEMENT, LLC | Civil Action File No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs SAJJAD CHOWDHURY, Individually, As Next of Kin of SHAHEDA CHOWDHURY, and as Personal Representative of the ESTATE OF SHAHEDA CHOWDHURY, (hereinafter "Plaintiffs"), by and through Plaintiffs' attorneys, bring this action against Defendants Johnson & Johnson, Inc. (*J&J*), Johnson & Johnson Consumer, Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. (*JJCI*), LLT Management, LLC F/KA LTL Management, LLC and states the following:

This is a renewal action filed under the provisions of O.C.G.A. § 9-2-61 and other sections of Georgia Law. This action was originally filed in the IN THE STATE COURT OF GWINNETT COUNTY, STATE OF GEORGIA, Civil Action File No. 20-C-00166-S1 on January 9, 2020. Said original action was not a void suit having timely service of process perfected on Defendants at the time of filing. Plaintiffs ask the Court to take judicial notice of the original action in this matter. Said original action was later dismissed by Plaintiffs without prejudice on March 28, 2024 pursuant

to F.R.C.P. 41 after proper service of the same. This renewal action is 'substantially the same cause of action' as the initial action. All costs and expenses have been paid prior to the refiling of this renewal action pursuant to O.C.G.A. § 9-2-61. No other dismissals have been made. As such, this renewal action is just and proper under Georgia Law.

## **INTRODUCTION**

1.      This action arises from Shaheda Chowdhury's diagnosis of ovarian cancer. Ms. Chowdhury's ovarian cancer was a direct and proximate result of Defendants' and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with researching, processing, manufacturing, testing, bottling, labeling, packaging, and distributing Johnson & Johnson Baby Powder. This product will be referred to as *the J&J Product* in the rest of this Complaint.

2.      Ms. Chowdhury seeks recovery for damages as a result of her ovarian cancer, which was directly and proximately caused by such wrongful conduct by Defendants.

## **PARTIES**

3.      At all times relevant hereto, Plaintiffs were residents and citizens of Gwinnett County in Georgia.  Prior to her death, Shaheda Chowdhury resided in Gwinnett County, Georgia.

4.      Defendant, Johnson & Johnson, is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. It may be served with process of this Court via service at that address.

5.      At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the J&J Product. At all relevant times, J&J regularly transacted, solicited, and conducted business in all States of the United States, including Georgia.

6.      Defendant Johnson & Johnson Consumer, Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. is a New Jersey corporation with its principal place of business in the State of New

Jersey. Johnson & Johnson Consumer, Inc. may be served with process of this Court via service on its registered agent, CT Corporation System, at 289 S Culver Street, Gwinnett County, Lawrenceville, Georgia 30046-4906.

7.      In October 2021, Defendant J&J and Old JJCI engaged in a maneuver referred to as the "Texas Two-Step." First, Old JJCI merged into Chenango Zero, LLC, a Texas limited liability company. Then, Chenango Zero, LLC effected a divisional merger under the Texas Business Organizations Code, resulting in the dissolution of Chenango Zero, LLC and the formation of two new companies: Chenango One, LLC and Chenango Two, LLC. Following the divisional merger, Old JJCI ceased to exist. All Old JJCI legacy talc-related liabilities were transferred to the newly created Chenango One, LLC, and all remaining Old JJCI operating assets were transferred to Chenango Two, LLC. Chenango One, LLC, then reincorporated in North Carolina and changed its name to LTL Management, LLC and then again to LLT Management, LLC (hereafter also referred to as *LTL*). Chenango Two, LLC merged into Curahee Holding Company Inc., which name was then changed to Johnson & Johnson Consumer Inc.

8.      Then, LTL declared bankruptcy (twice). LTL's bankruptcy filings have now been dismissed.   During the pendency of two bankruptcy filings, Decedent's claims for talc-related injuries were stayed.

9.      Defendant LLT Management, LLC f/k/a LTL Management, LLC (hereafter also referred to as LTL) is a North Carolina limited liability company and a New Jersey citizen.  It is one of the successors in interest to the OLD JJCI LTL and/or its predecessors regularly conduct business in Philadelphia County.  Defendants Johnson & Johnson, Johnson & Johnson Consumer Inc., and LTL have all been under Defendant J&J's control and will also be individually and/or collectively re-ferred to as Defendants, Johnson & Johnson, and /or *J&J* in this Complaint.

10.      At all relevant times, upon information and belief, Johnson & Johnson Consumer,

Inc. was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the J&J Product.  At all relevant times, Johnson & Johnson Consumer, Inc. regularly transacted, solicited, and conducted business in all States of the United States, including Georgia.

11.     At all relevant times, Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc. have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the J&J Product.

12.     Defendant Johnson & Johnson Consumer, Inc. is and has been at all relevant times a wholly owned subsidiary of Defendant Johnson & Johnson. It is under the complete dominion of and control of Defendant Johnson & Johnson. These two entities together will be referred to collectively as *the J&J Defendants*.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the J&J Defendants pursuant to O.C.G.A. § 9-10-91. The causes of action described in this Complaint arose from acts, omissions, uses, and ownership enumerated in § 9-10-91. Further, the J&J Defendants, or their agents, regularly and systematically transact business in Georgia, have a registered agent in Georgia, and have committed tortious acts and omissions in Georgia. Further, the J&J Defendants committed a tortious injury to Ms. Chowdhury in Georgia caused by an act or omission outside this State. They have committed tortious acts both inside and outside the State of Georgia while regularly doing business in Georgia and engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used and/or consumed and/or services rendered in Georgia. These acts included bottling, labeling, shipping, testing, and otherwise manufacturing the J&J Product.

14.     This Court has specific jurisdiction over the J&J Defendants. The J&J Defendants put into the stream of commerce the J&J Product that Ms. Chowdhury purchased and used in Georgia and that injured her in Georgia, showing there is a connection between Ms. Chowdhury's claims and the forum. Further, the J&J Defendants have minimum contacts with Georgia so they can reasonably anticipate being hauled into court in Georgia. The J&J Defendants engage in the research, development, manufacturing, design, testing, packaging, distributing, sale, advertising, promotion, and marketing of the J&J Product in Georgia. The J&J Defendants introduced the J&J Product into interstate commerce with the knowledge and intent that it would be sold in Georgia and they have been marketing, advertising, selling, and otherwise doing business in Georgia for decades, including selling the J&J Product in Georgia—intentionally availing themselves of Georgia and her markets, laws, business opportunities, and citizens.

## FACTS COMMON TO ALL COUNTS

15.     Talc is a magnesium trisilicate that is mined from the earth. Talc is an inorganic mineral.

16.     Talc is used in a wide array of industrial, commercial, and cosmetic substances. It is the main component in talcum powders, talc-based body powders and the J&J Product. The J&J Product is composed almost entirely of talc along with certain other elements including talc as well as a variety of heavy metals including nickel, cobalt, arsenic, cadmium, mercury, chromium, and others.

17.     At all relevant times, a reasonable, feasible, and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed, including by the Defendants, for the same uses as the J&J Product and with the same or better effectiveness.

18.     Johnson's Baby Powder is made up of 99% talc.

19.     At all relevant times, the J&J Defendants advertised and marketed their "Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild." The J&J Defendants induced women through advertisements to dust themselves with this product to mask odors. The Johnson's Baby Powder bottle specifically targets women, stating "For you, use every day to help feel soft, fresh, and comfortable."

20.     Although the labels on the bottles for the Johnson's Baby Powder have changed over time, the core message has been the same — women can safely use the J&J Product on their bodies including their genital areas.

21.     Ms. Chowdhury used the J&J Product to dust her perineum for feminine hygiene purposes. This was an intended and foreseeable use of the J&J Product based on the advertising, marketing, and labeling of the J&J Product.

22.     The J&J Product was then purchased by Plaintiff from retail locations in the State of Georgia.

23.     As early as 1961, research established that some particles, including particles like talc, can translocate from the exterior genital area to the ovaries in women. *See* G.E. Egli, and Michael Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract*, 12 FERTILITY STERILITY 2, 151–55 (1961).

24.     In 1964, Johnson & Johnson admitted in an internal company document that talc could not be safely absorbed by the vagina, but cornstarch could.

25.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. WJ Henderson and others in Cardiff, Wales.

26.     Upon information and belief, since the publication of these studies in the early 1970s, Defendants have been on notice of an association between talc exposure and ovarian cancer.

27.     Since 1982, there have been more than 27 additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women. As early as the mid-1970s, Johnson & Johnson was aware of studies and data suggesting an association between talc and ovarian cancer. For example, in an internal document, J&J admits that this knowledge "puts them on notice" of the association. At or around this same time, Johnson & Johnson sent a donation to the Cardiff Scientific Society to obtain information concerning research being conducted by the Tenovus Institute, further proving they were on notice of the "talc and ovarian cancer problem."

28.     On August 12, 1982, Johnson & Johnson publicly recognized the studies linking the use of the J&J Product to ovarian cancer. In a *New York Times* article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," the company admitted to being aware of the 1982 Cramer article that concluded that women who apply talc daily to their genital areas were three times more likely to contract ovarian cancer.

29.     A Johnson & Johnson Technology Forecast, dated 1986, acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health benefit.  The document also acknowledged that "[r]etrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer."

30.     In approximately 1992, Johnson & Johnson noticed some obstacles in its product growth as the rumors of talc-powder and ovarian-cancer problems grew. In response, the J&J Defendants were looking for "major opportunities" and decided to implement a plan that targeted Hispanic and African American women through various media outlets. This demographic targeting

would continue over the years.

31.     The Cosmetic Toiletry and Fragrance Association (*CTFA*) formed the Talc Interested Party Task Force (*TIPTF*). Johnson & Johnson, Inc. and Johnson & Johnson Consumer Companies, Inc., were members of the CTFA and were the primary actors and contributors of the TIPTF. The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired scientists to perform biased research regarding the safety of talc. And members of the TIPTF edited scientific reports of the scientists hired by this group before the submission of these scientific reports to governmental agencies. Further, members of the TIPTF knowingly released false information about the safety of talc to the consuming public; they used political and economic influence on regulatory bodies regarding talc.

32.     While the TIPTF efforts are just some of the latest attempts to prevent regulations, the Defendants and affiliated organizations have used a well-coordinated strategy over the past six decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

33.     At all times relevant, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc-based body powder and acted as a mouthpiece for the members of the TIPTF, including the J&J Defendants.  PCPC, completely reliant on funding from cosmetic-industry companies, was motivated to defend talc and talc-based body powders to retain its members involved with this J&J Product and retain their revenues.

34.     Upon information and belief, and at all times relevant, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales.  In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating a direct

pecuniary interest in defending the safety of talc, talc-based body powders and the J&J Product.

35.     In or around 1976, the Cosmetic Ingredient Review (*CIR*) was formed to give PCPC and the cosmetic industry more credibility for self-regulation.  Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal-care industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC and its employees are paid by PCPC.

36.     Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately thousands of ingredients to be "safe as used." Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances. Over the course of these annual meetings, the panel is able to review about 500 ingredients per year.  On average, only about 20 minutes is spent discussing the safety of each ingredient. Meanwhile other prestigious regulatory bodies, including the European Union and Canada have found many of these same ingredients deemed safe by the CIR to be carcinogenic or otherwise dangerous for cosmetic use.

37.     Even though PCPC knew of the safety concerns surrounding talc and talc-based body powders for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants, including PCPC, influenced the CIR scientists' writing and reviews and, ultimately, edited the reviews in a biased manner.  Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

38.     Upon information and belief, in or about 1990, the U.S. Food and Drug Administration (*FDA*) asked manufacturers to voluntarily stop putting talc on surgical gloves

because mounting scientific evidence showed that it caused adhesions in surgical patients, an indication of a foreign-body reaction. On December 19, 2016, the FDA issued a ban on powdered surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial."

39.    On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.O, Ralph Larsen, informing his company that studies as far back as 1960's ". . . show [ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc J&J Product from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.

40.    In or about 1996, the FDA requested that the condom industry stop dusting condoms with talc due to the health concerns from studies linking talc to ovarian cancer. Upon this request, the condom industry stopped dusting condoms with talc in its manufacturing process.

41.    On or about September 17, 1997, Johnson and Johnson's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by the CTFA/PCPC (as an agent of the Defendants) on at least three separate occasions. Dr. Wehner let the company know that the current epidemiology studies did in fact show a statistically significant association between hygienic talc use and ovarian cancer, "and that anybody who denies this risk that the talc industry will be perceived by the public like it perceives the cigarette industry; denying

the obvious in the face of all evidence to the contrary."

42.     In February of 2006, the International Association for Research on Cancer (*IARC*), part of the World Health Organization, published a paper that classified perineal use of talc-based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16–52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in female talc users ranging from 30–60%. IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "[l] limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

43.     In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their groin area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc J&J Products in that area.

44.     The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont publish a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

45.     Defendants knew or should have known of the adverse risks of using talc and talc-based body powders in the perineal area and developing ovarian cancer for decades and had a duty to warn about the potential hazards associated with the use of the J&J Product.

46.     In 2016, Johnson & Johnson registered Baby Powder under the California Safe Cosmetics Act. This law was established to compel cosmetic manufacturers to register ingredients that are "known" or "suspected" carcinogens.

47.     Other national manufacturers of talc-based body powders have placed warnings on their J&J Product cautioning consumers to not use the product in the genital area because of ovarian cancer risk.

48.     Despite the decades of mounting scientific and medical evidence supporting the association between genital talc use and ovarian cancer-development, and their own internal knowledge, Defendants never placed a warning label or otherwise informed their users, including Plaintiff, that the use of the J&J Product in the genital area could lead to an increased risk of ovarian cancer.

49.     The Defendants failed to inform its customers and users of J&J Product of a known catastrophic health hazard associated with the use of its J&J Product.

50.     In addition, the Defendants procured and disseminated false, misleading, and biased information regarding the safety of the J&J Product to the public and used influence over governmental and regulatory bodies regarding talc.

51.     As a direct and proximate result of the Defendants' calculated and reprehensible conduct, Ms. Chowdhury was injured and suffered damages, namely ovarian cancer, which required surgeries and treatments.

## MS. CHOWDHURY'S USE OF THE J&J PRODUCTS

52.     Plaintiff Shaheda Chowdhury began using J&J Product around 1995. She used it until around 2018.

53.     Ms. Chowdhury used J&J Product to dust her perineal area.

54.     There was never any indication on J&J Product itself that this reasonably anticipated use would lead to her developing ovarian cancer.

55.     Plaintiff Shaheda Chowdhury was diagnosed with Epithelial Ovarian Cancer in 2018.

56.     Plaintiff Shaheda Chowdhury passed away on May 7, 2023.

57.     Shaheda Chowdhury had ovarian cancer and suffered from it. This injury was a direct and proximate result of the unreasonably dangerous and defective nature of the J&J Product and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, processing, production, and distribution of the J&J Products. Ms. Chowdhury was injured and suffered damages, including death.

## COUNT I – STRICT LIABILITY (FAILURE TO WARN)

58.     Plaintiff incorporates here the earlier paragraphs.

59.     At all pertinent times, the J&J Defendants were manufacturing, marketing, testing, promoting, selling, and/or distributing the J&J Product in the regular course of business.

60.     At all pertinent times, Ms. Chowdhury used the J&J Product to powder her perineal area, which is a reasonably foreseeable use.

61.     At all relevant times, the J&J Product had potential risks or presented a substantial danger when foreseeably used. These risks were known or knowable in light of the scientific and medical knowledge that was being accepted in the scientific community at the time of the manufacture, distribution, and sale of the J&J Product.

62.     On information and belief, ordinary consumers and the general public were not aware and/or would not have recognized the potential risks or dangers described herein. Nor did Ms. Chowdhury.

63.     Defendants knew or should have known that the J&J Product was being sold without a warning and did not take the additional steps it should have, including inquiring with the J&J Defendants about its warning practices, to ensure that warnings were being communicated to consumers.

64.     At all relevant times Defendants could and should have had superior knowledge relating to information on the dangers of use of the J&J Product in the genital area and refused or neglected to pass this knowledge onto the public. Defendants could and should have warned consumers, including Plaintiff about the risks of said dangers.

65.     At all relevant times Defendants failed to adequately warn that the J&J Product presented substantial dangers, which would not be recognized by ordinary consumers, when used in an intended or reasonably foreseeable way.

66.     The Defendants' conduct violated the common law, legal theories of strict liability for failure to warn, and O.C.G.A. § 51-1-11, among others. As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product which directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering. Plaintiff Shaheda Chowdhury, therefore, is entitled to recover from Defendants all damages allowed under Georgia Law, including but not limited to damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

**COUNT II – STRICT LIABILITY (DESIGN AND/OR MANUFACTURING DEFECT)**

67.     Plaintiff incorporates here the earlier paragraphs.

68.     Defendants engaged in the design, development, manufacture, marketing, mislabeling, mispackaging, sale, and distribution of the J&J Product in a defective and unreasonably

14

dangerous condition to consumers, including Plaintiff.

69.     Defendants caused the J&J Product to enter the stream of commerce and to be sold through various retailers, including in the State of Georgia, where Plaintiff purchased the J&J Product.

70.     The J&J Product was expected to, and did, reach consumers, including Plaintiff, without change to the condition in which they were manufactured and sold by Defendants and/or otherwise introduced into the stream of commerce.

71.     Ms. Chowdhury used the J&J Product in a manner normally intended, recommended, marketed, promoted, and known by Defendants.

72.     The J&J Product failed to perform safely when used by Plaintiff in a reasonably foreseeable manner. This failure caused Ms. Chowdhury to develop ovarian cancer.

73.     The propensity of talc fibers to translocate into the female reproductive system, including, but not limited to, the ovaries and endometrial lining of the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, ovarian cancer, renders the J&J Product unreasonably dangerous when used in a reasonably foreseeable or intended manner. These dangers are not something that would be contemplated by the ordinary consumer.

74.     Importantly, the J&J Product is a nonessential cosmetic product that does not treat or cure any serious disease, illness, or have any other noticeable beneficial effects. Furthermore, safer alternatives, including cornstarch-based powders, which are also made by Defendants, have been readily available for decades.

75.     Defendants have known, or should have known, that the J&J Product is unreasonably dangerous when used by a woman in her perineal area, but continued to design, manufacture, sell, distribute, market, label, promote, and supply the J&J Product so as to maximize

sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consumer public, including Plaintiff. Notably, Defendants have admitted in internal documents that they could be considered to be placing "profits over the health and safety of the women and children who used their J&J Products."

76.    The Defendants' conduct violated the common law, legal theories of strict liability for product and manufacturing defect, and O.C.G.A. § 51-1-11, among other laws and statutes. As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the aforesaid J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death.  Therefore, Shaheda Chowdhury is entitled to recover from Defendants all damages allowed under Georgia Law, including but not limited to damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT III – PRODUCT LIABILITY

77.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

78.    The J&J Product was sufficiently defective to cause the Defendants to be liable to Plaintiff. The J&J Product was defective, *inter alia*, in its design, manufacture, and lack of proper or sufficient warnings. The J&J Product possessed latent characteristics and latent manufacturing and design defects existing at the time it was manufactured and at the time Plaintiff was exposed to the J&J Product. Each Defendant either knew, or in the exercise of reasonable care should have known, that the J&J Product would cause injuries in the form of ovarian cancer to those individuals, such as Plaintiff, who were exposed to the J&J Product.

79.    At the time the Defendants sold and delivered the J&J Product, which resulted in

Plaintiff's exposure to the J&J Product, and at the time that the J&J Product was used in the manner and environment intended and without substantial change affecting their condition, the J&J Product contained latent characteristics or latent manufacturing and design defects, and was defective and unreasonably dangerous and unfit for its intended use in that:

a.      The J&J Product was defectively designed to contain talc or to result in the disbursement of talc, a substance which is deleterious, poisonous, and highly harmful to Plaintiff and others similarly situated.

b.      The J&J Product contained inadequate warnings and otherwise failed to contain a warning sufficient to advise Plaintiff that the J&J Product associated with its intended use were dangerous and extremely harmful to her health.

80.    Defendants were engaged in the distribution and sale of the J&J Product, without substantial change in the condition in which each Defendant sold it. This product and its sale to Plaintiff was the proximate cause of Plaintiff's injuries.

81.    Each Defendant and its predecessor in interest knew that its J&J Product would be used without inspection for defects. By placing the J&J Product on the market, they represented that it would safely do the job for which it was intended, which must necessarily include the safe handling and use of the J&J Product.

82.    Plaintiff was unaware of the hazards and defects in the J&J Product of the Defendants, which made that J&J Product unsafe for the purposes of its intended use, to the degree that the J&J Product would cause Plaintiff to develop ovarian cancer and other related physical conditions.

83.    At all times relevant hereto, the J&J Product was used in the manner intended by the Defendants.

84.     Plaintiff is entitled to recover damages against each Defendant under a theory of product liability, which includes negligence and statutory causes of action, including O.C.G.A. § 51-1-11, in an amount to be proven at trial.

85.     As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death.  Therefore, Plaintiff Shaheda Chowdhury is entitled to recover from Defendants all damages allowed under Georgia Law, including, but not limited to, damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT IV – NEGLIGENCE

86.     Plaintiff incorporates here the earlier paragraphs.

87.     The Defendants were negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling, and/or distributing the J&J Product in one or more of the following respects:

a.      In failing to warn Plaintiff of the hazards associated with the use of J&J Product;

b.      In failing to properly test the J&J Product to determine adequacy and effectiveness or safety measures, if any, before releasing the J&J Product for consumer use;

c.      In failing to properly test the J&J Product to determine the increased risk of ovarian cancer during the normal and/or intended use of the J&J Product;

d.      In failing to inform ultimate users, such as Plaintiff as to the safe and proper methods of handling and using the J&J Product;

e.      In failing to remove the J&J Product from the market when Defendants knew

or should have known that the J&J Product was defective;

      f.     In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the J&J Product which caused increased risk of cancer, including, but not limited to, ovarian cancer;

      g.     In failing to inform the public in general and Plaintiff in particular of the known dangers of using J&J Product for dusting the perineum;

      h.     In failing to advise users how to prevent or reduce exposure that caused increased risk for cancer, including, but not limited to, ovarian cancer;

      i.     In marketing and labeling the J&J Product as safe for all uses despite knowledge to the contrary; and

      j.     In failing to act like a reasonably prudent company under similar circumstances.

88.     Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries of Plaintiff.

89.     At all pertinent times, Defendants knew or should have known that the J&J Product was unreasonably dangerous and defective when put to its reasonably anticipated use.

90.     As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death.  Therefore, Plaintiff Shaheda Chowdhury is entitled to recover from Defendants all damages allowed under Georgia Law, including, but not limited to, damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT V – NEGLIGENT MISREPRESENTATION

91.     Plaintiff incorporates here the earlier paragraphs.

92.     Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, and the public, including Plaintiff, that the J&J Product had been tested and found to be safe and effective for personal use, including in the perineal area. The Defendants made these representations which were, in fact, false.

93.     Defendants failed to exercise ordinary care in the representations concerning the J&J Product while they were involved in its manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the J&J Product's high risk of unreasonable, dangerous, adverse side effects.

94.     Defendants breached their duty by representing that the J&J Product had no serious side effects.

95.     As a foreseeable, direct, and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the J&J Product had been insufficiently tested, or had not been tested at all, and that it lacked adequate and accurate warnings, and that it created a substantial risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, but not limited to, ovarian cancer.

96.     As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the aforesaid J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death. Therefore, Plaintiff Shaheda Chowdhury is entitled to recover from Defendants all damages allowed under Georgia Law,

including but not limited to damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT VI – FRAUD

97.     Plaintiff incorporates here the earlier paragraphs.

98.     Defendants, who engaged in the development, manufacture, marketing, sale and distribution of the personal hygiene J&J Product, owed a duty to provide accurate and complete information regarding said J&J Product.

99.     Defendants fraudulently misrepresented the use of the J&J Product as safe and effective, specifically;

a.      For more than 60 years, Defendants have represented to the public that talc is safe when used on a woman's body. However, in 1964, internal documents showed that talc cannot be safely absorbed through the vagina, whereas cornstarch can;

b.      In the 1970s the Defendants represented to the FDA that they would not hesitate to take talc-based body J&J Product off the market if any study showed "any potential health or safety risk." Defendants have admitted numerous studies have shown increased risk through genital talc use;

c.      Defendants have represented to the public that talc cannot translocate from the perineum through the vaginal tract and into the ovaries. Internal documents of the Defendants show they know this to be untrue. Defendants have represented to the public that genital talc use is safe. IARC, the recognized world authority of carcinogens, has determined that there is a credible consistent association between feminine talc use and ovarian cancer;

d.      Defendants' own paid consultant, Dr. Alfred Wehner, advised the company

on multiple occasions, up to and including in 1997, that Defendants and their agent CTFA's denial of a positive association between feminine talc use and ovarian cancer was "technically and factually incorrect;"

e.     Defendants have continuously represented to the public that talc is not harmful, all while internal documents from Defendants repeatedly acknowledge that talc has been found toxic by various governmental and regulatory agencies and numerous findings regarding the toxicity of talc and its carcinogenic nature;

f.     Defendants have represented to the public that certain governmental agencies have not regulated or found talc to be carcinogenic, however, Defendants have represented that the 2013 CIR (Cosmetic Ingredient Review) of talc and its finding that talc is safe for current uses was an independent finding. The evidence instead shows that the CIR review was largely funded and controlled by industry interests including the Defendants. Furthermore, some of the Defendants contributed paragraphs and language used in the final CIR report. The evidence also shows that the main scientific reviewer as well as a second voting panel member were "consultants" for the Defendants during the review period for talc;

g.     Johnson & Johnson's website calls it a "misconception" that talc in baby powder can be "absorbed into the body".

h.     Johnson & Johnson print advertisements directed at adult women asserted that, because Johnson & Johnson Baby Powder is used on babies, women can "trust" that Johnson & Johnson will take "just as much care" of their skin;

i.     Johnson & Johnson has engaged in misleading advertisements that the talc used in the J&J Product is safe because it comes from "nature" and is "pure"'.

j.      Johnson & Johnson, on its own website, claims that "30 years of research by independent scientists, review boards and global authorities [ ] have concluded that talc can be used safely in personal care J&J Products," meanwhile they fail to mention the dozens of studies that demonstrate a consistent and statistically significant relationship between hygienic talc use and ovarian cancer, as well as the decision by IARC to label perineal talc powder use as "possibly carcinogenic"; and on the Johnson's Baby Powder bottle, Defendants include a conspicuous warning to mothers to prevent babies from inhaling the powder and the inclusion of this lone warning implies to the consumer that Johnson & Johnson Baby Powder is safe in all other manners of use.

100.    Defendants knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive and/or deceitful when they were made.

101.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and/or omissions.

102.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the J&J Product on a regular basis for decades.

103.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

104.    Defendants' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurring substantial damages.

105.    As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical

bills and conscious pain and suffering, including death.  Plaintiff Shaheda Chowdhury, therefore, is entitled to recover from Defendants all damages allowed under Georgia Law, including but not limited to damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT VII – FRAUDULENT CONCEALMENT

106.    Plaintiff incorporates here the earlier paragraphs.

107.    Defendants owed consumers, including Plaintiff, a duty to fully and accurately disclose all material facts regarding the J&J Product, not to conceal material defects, related thereto, not to place this defective J&J Product into the stream of commerce, and to fully and accurately label product packaging. On the contrary, Defendants explicitly and/or implicitly represented that the J&J Product was safe and effective.

108.    Defendants actively and intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use the J&J Product and did so at her expense. Specifically:

a.    For more than 50 years, Defendants have represented to the public that talc is safe when used on a woman's body. However, in 1964, internal documents reveal that Defendants knew talc cannot be safely absorbed in the vagina, whereas cornstarch can;

b.    In the 1970s the Defendants represented to the FDA that they would not hesitate to take talc-based body J&J Products off the market if any study showed ANY potential health or safety risk. Johnson & Johnson have since admitted numerous studies have shown an increase in risk through genital talc use;

c.    Defendants have represented to the public that talc cannot translocate from the perineum through the vaginal tract into the ovaries. However, the internal documents of

the Defendants show they know this to be otherwise. Defendants have represented to the public that genital talc use is safe. IARC, the recognized world authority of agent carcinogenicity, has determined that there is a credible casual connection between feminine talc use and ovarian cancer;

       d.      Defendants own paid consultant, Dr. Alfred Wehner, advised the Defendants on multiple occasions, from as early as 1994, that Defendants' denial of a positive association between feminine talc use and ovarian cancer was "technically and factually incorrect".

       e.      Recent studies have established a statistically significant correlation between talcum powder use in the perineal area and ovarian cancer;

       f.      Defendants have represented to the public that talc is not harmful, meanwhile internal documents from Defendants state that talc is toxic and recognized other governmental agencies findings regarding the toxicity of talc and its carcinogenic nature;

       g.      Defendants have represented to the public that certain governmental agencies have not regulated or found talc carcinogenic, however, Defendants have repeatedly represented that the 2013 CIR (Cosmetic Ingredient Review) of talc as safe for intended use is an independent finding from unbiased reviewers. The evidence has shown that the main scientific reviewers as well as a second voting panel member were "consultants" for the Defendants during the review period for talc. Furthermore, it has been shown the CIR is fully funded by the CTFA/PCPC of which Defendants are principal and very influential members;

       h.      Johnson & Johnson's website calls it a "misconception" that talc in baby powder can be "absorbed into the body".

i.      Johnson & Johnson print advertisements directed at adult women asserted that, because Johnson & Johnson Baby Powder is used on babies, women can "trust" that Johnson & Johnson will take "just as much care" of their skin;

j.      Defendants misled consumers in numerous advertisements that the talc in the J&J Product is safe because it comes from "nature" or is "all natural" and is "pure".

k.      Johnson & Johnson, on its own website, claims that "30 years of research by independent scientists, review boards and global authorities [ ] have concluded that talc can be used safely in personal care J&J Products," meanwhile they fail to mention the dozens of studies that demonstrate a consistent and statistically significant relationship between hygienic talc use and ovarian cancer, as well as the decision by IARC to label perineal talc powder use as "possibly carcinogenic"; and

l.      On the Johnson's Baby Powder bottle, Defendants include a conspicuous warning to mothers to prevent babies from inhaling the powder and the inclusion of this lone warning implies to the consumer that Johnson & Johnson Baby Powder is safe in all other manners of use.

109.    Plaintiff alleges that the talcum powder J&J Product mined, milled, imported, designed, manufactured, processed, marketed, labeled, supplied, distributed, sold and otherwise placed in the stream of commerce by Defendants contains not only talc but heavy metals. The heavy metals can include nickel, chromium, cadmium, cobalt, copper, iron, lead, and manganese and can also be contaminated by other known carcinogens such as arsenic and quartz. Defendants knew of these talc contaminants and that many of these contaminants could never be fully or effectively removed from J&J Product.

110.    For more than 50 years Defendants actively sought to suppress public knowledge

and/or awareness of the presence of the dangers of the J&J Product even as they performed detailed experimental analyses and testing which studied in detail the dangers of talc in the J&J Product.

111.    Defendants engaged in wrongful conduct, were negligent, and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, manufacturing, supplying, distributing, designing, labeling, and selling the J&J Product, which Defendants knew or should have known were dangerous and posed a substantial risk of harm to others, including Plaintiff.

112.    Defendants failed to provide any information and failed to warn users of the J&J Product that such J&J Product may pose harm to persons, including Plaintiff. Instead, Defendants conspired to misrepresent and conceal the facts regarding the dangers of its talc.

113.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding Plaintiff, and with the intention of having her act and rely on such misrepresentations and/or omissions.

114.    Defendants knew that their concealments, misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made. Alternatively, Defendants concealed information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

115.    Defendants profited, significantly, from their unethical and illegal conduct that caused Plaintiff to purchase and habitually use a dangerous and defective product.

116.    Defendants' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

117.    As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately

caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death. Therefore, Plaintiff Shaheda Chowdhury is entitled to recover from Defendants all damages allowed under Georgia Law, including, but not limited to, damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT VIII – FRAUDULENT CIVIL CONSPIRACY

118.     Plaintiff incorporates here the earlier paragraphs.

119.     Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, and conspired among themselves to cause Plaintiff's injuries, disease, and/or illnesses by exposing the Plaintiff to the harmful and dangerous J&J Product. Defendants further knowingly agreed, contrived, confederated and conspired to deprive the Plaintiff of the opportunity of informed free choice as to whether to use the J&J Product or to expose herself to said dangers. Defendants committed the above-described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to the J&J Product.

120.     In furtherance of said conspiracies, Defendants performed the following overt acts:

a.      For many decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature, and test reports which clearly indicated ordinary and foreseeable use of the J&J Product by women presented an unreasonably dangerous, hazardous, carcinogenic, or potentially dangerous condition.

b.      Despite this medical and scientific data, literature, and test reports possessed by and available to Defendants they, individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously:

i.      Withheld, concealed and suppressed said medical information regarding the increased risk of ovarian cancer from Plaintiff (as set out in the "Facts" section of this pleading);

ii.     Caused to be released, published, and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer which Defendants knew were incorrect, incomplete, outdated, and misleading. Specifically, for example, the Defendants, through the TIPTF, collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. In a letter dated September 17, 1997, the Defendants were criticized by their own toxicology consultant for releasing this false information to the public, yet nothing was done by the Defendants to correct or redact this public release of knowingly false information.

c.      Johnson & Johnson conspired with others to fund a group to defend all things talc; they worked to "clean up the internet" in regard to public statements that had been made or published regarding the risks and dangers associated with talc used in the perineal region.

d.      By these false and fraudulent representations, omissions, and concealments, Defendants intended to induce the Plaintiff to rely upon said false and fraudulent representations, omissions and concealments, and to continue to expose herself to the dangers inherent in the use of and exposure to the J&J Product.

121.   Plaintiff reasonably and in good faith relied upon the aforementioned fraudulent representations, omissions, and concealments made by Defendants regarding the nature of the J&J

Product.

122.     As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death.  Therefore, Ms. Chowdhury is entitled to recover from Defendants for all damages allowed under Georgia Law, including, but not limited to, damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

## COUNT IX – PUNITIVE DAMAGES

123.     Plaintiff incorporates here the earlier paragraphs.

124.     Plaintiff is entitled to punitive damages because Defendants' wrongful acts and/or omissions have constituted willful misconduct, malice, wantonness, fraud, oppression and exhibit an entire want of care with a conscious indifference to the consequences of their actions. Defendants' conduct is demonstrated by the following:

a.     At all relevant times, Defendants knew of the unreasonably high risk of cancer, including, but not limited to, ovarian cancer, posed by J&J Product. They knew of this risk before manufacturing, marketing, distributing, and/or selling the J&J Product, yet purposefully proceeded with such action;

b.     At all relevant times, despite their knowledge of this high risk of cancer, including but not limited to, ovarian cancer associated with the J&J Product, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling; and At all relevant times, Defendants continued to promote the J&J Product as safe for perineal use. They failed to provide adequate warnings regarding the risk of developing ovarian cancer if using the J&J Product in the perineal area;

c.    At all relevant times, Defendants had knowledge of safer alternative designs for the J&J Product and failed to substitute such safer design.

125.    Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of the J&J Product, including the Plaintiff. Defendants' conduct, as described herein, knowing the dangers and risks of the J&J Product, yet concealing, conspiring to conceal, and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' evil motive or reckless indifference to the safety of users of the J&J Product.

126.    As a foreseeable, direct, and proximate result of Defendants' acts and/or omissions, Plaintiff Shaheda Chowdhury purchased and used the J&J Product that directly and proximately caused her to develop ovarian cancer. Plaintiff Shaheda Chowdhury was caused to incur medical bills and conscious pain and suffering, including death. Plaintiff Shaheda Chowdhury is, therefore, entitled to recover from Defendants all damages allowed under Georgia Law, including, but not limited to, damages for medical and other necessary expenses resulting from her diagnosis of ovarian cancer.

**COUNT X - PRE-DEATH INJURY AND PAIN AND SUFFERING** (All Defendants)

127.    Plaintiffs hereby incorporate by reference all of the above allegations as if fully forth herein.

128.    As a direct and proximate result of the acts and omissions of Defendant, Shaheda Chowdhury was injured and suffered damages prior to her death, for which Plaintiffs may recover including, but not limited to: pre-death physical injury; pre-death physical pain and suffering; pre-death mental pain and suffering; pre-death impairment, disability and disfigurement; loss of capacity to enjoy life; loss of capacity to work or earn a living; loss of time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical

procedures; pre-death expenses of hospitalization, medical care, nursing care, other treatment and medical monitoring; pre-death fear and mental anguish associated with Shaheda Chowdhury's impending death; as well as all other special and general damages permitted under law.

## COUNT XI - WRONGFUL DEATH

129.   Plaintiffs hereby incorporate by reference all of the above allegations as if fully set forth herein.

130.   As a result of the individual, combined and concurring acts and omissions of Defendant as set forth herein above caused or contributed to cause injuries to Shaheda Chowdhury for which Plaintiffs may recover.  Such damages include damages which may be recovered for:

a.   The homicide and wrongful death of Shaheda Chowdhury, deceased, entitling Plaintiffs to recover the full value of Shaheda Chowdhury's life, as well as all other damages permitted under law;

b.   Expenses associated with the last illness, death and burial of Shaheda Chowdhury;

c.   Pre-death physical injury, pain and suffering, disability, impairment, lost capacity to enjoy life, mental anguish, and lost earnings of Shaheda Chowdhury in an amount to be proven at trial which may be recovered by Plaintiffs;

d.   Pre-death medical expenses of Shaheda Chowdhury in an amount to be proven at trial; and

e.   Pre-death fear and mental anguish of Shaheda Chowdhury concerning existing and future medical problems in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following damages be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiff Shaheda Chowdhury:

f.      Severe impairment to her ovaries and reproductive system;

g.      Medical expenses;

h.      Pain and suffering;

i.      Mental anguish, anxiety, and discomfort;

j.      Lost wages and income;

k.      Fear of cancer or other related diseases;

l.      Physical impairment;

m.      Physical disfigurement;

n.      Loss of enjoyment of life;

o.      Pre- and post-judgment interest;

p.      Exemplary and punitive damages in an amount to be determined at trial;

q.      Treble damages;

r.      General damages;

s.      Reasonable and necessary attorneys' fees and other disbursements  and expenses of this action;

t.      Pre-Death injury and pain and suffering;

u.      Wrongful Death; and

v.      Such other relief to which Plaintiff Shaheda Chowdhury may be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all Counts and as to all issues and allegations

presented herein.

This 17th day of May 2024.

*/s/: M. Brandon Smith*
M. Brandon Smith
GA Bar No. 141418
CHILDERS, SCHLUETER & SMITH, LLC
1932 N. Druid Hills Road, Suite 100
Atlanta, GA 30319
Telephone: (404) 419-9500

Williams Hart & Boundas, LLP
John Boundas *Pro Hac Vice*
Sejal Brahmbhatt *Pro Hac Vice*
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone: (713 )230-2200

Attorneys for Plaintiff
